Filed 8/16/24  P. v. Atkins CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081786 |
| v. | (Super.Ct.No. BAF2000497) |
| LEON WALLACE ATKINS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Rene Navarro, Judge.

Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Monique Myers, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Leon Wallace Atkins of two felony counts of annoying a child. (Pen. Code, § 647.6, subds. (a)(1), (c)(2); unlabeled statutory references are to this code.) Atkins challenges the sufficiency of the evidence supporting one of those convictions. He also contends that his trial counsel was prejudicially ineffective for not objecting to the admission of certain evidence. We affirm.

## BACKGROUND

### I. *The charges*

Atkins was born in May 1961. In 2020, Atkins was charged with one count of failing to register as a sex offender (§ 290, subd. (b); count 1) and two counts of annoying a child (§ 647.6, subd. (c)(2); counts 2 & 3). The conduct underlying count 2 involved Jane Doe A.L., and the conduct underlying count 3 involved Jane Doe A.C. It also was alleged that Atkins suffered four prior strike convictions, including one conviction in 2000 for lewd and lascivious conduct involving a child under 14 years old (§ 288, subd. (c)). (§§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2).)

A.C. and A.L. are sisters. A.C. was born in December 2004, and A.L. was born in August 2006. Both testified at trial in February 2023, when they were 16 and 18 years old.

### II. *A.C.*

One day in March 2020, when A.C. and a friend were walking home after school, A.C. noticed a vehicle stop and idle in front of the friend's house. A.C. was 15 years old. A.C. initially testified that the idling vehicle was a red truck.

2

A.C.'s friend entered the house, and A.C. continued walking. When A.C. turned onto a smaller street, the truck followed behind A.C. The truck stayed approximately 10 to 20 feet behind A.C. A.C. "felt eyes on [her]" and "like [she] was going to be kidnapped." A.C. turned around and saw a man's silhouette, but she did not get a good look at the driver.

A.C. called her mother, Jacquelin M., to pick her up. A.C. was afraid. It took two to three minutes for Jacquelin to arrive, during which A.C. and Jacquelin remained on the phone. When Jacquelin arrived, the truck had pulled ahead of A.C. A.C. believed that the truck followed her for a total of three to seven minutes.

Jacquelin described A.C.'s demeanor as "scared and worried." At trial, the prosecution showed Jacquelin a photograph (People's Exhibit 2) that she identified as depicting the truck that A.C. pointed out to Jacquelin on that day that A.C. was followed. Atkins told a law enforcement officer that the truck belonged to him.

On another occasion, A.C. noticed the same truck drive by her house slowly. A.C. initially described the vehicle that drove by the house as a "red car." A.C. noticed the vehicle because it was unusual for cars to drive by her house. A.C. and her family lived in a rural area. A.C. described her house as being located on an unpaved road "[v]ery off the main street." A.C. knew everyone who lived on the street as well as the vehicles they drove. A.C. said that it was "not normal for vehicles to go past [her] house."

Jacquelin saw the truck depicted in People's Exhibit 2 drive by the house slowly "a couple of times." Jacquelin identified Atkins as the person who drove the truck.

3

A.C. stated on cross-examination that she believed the truck that was parked and idling in front of her friend's house was red. She also said that she could not recall the truck's color because the incident happened so long ago. She explained, "I say red because my brain automatically, like, clicks to red." A.C. explained on redirect examination that she was nervous and that her "memory becomes foggy after a while." Asked whether she remembered the color of the truck, A.C. answered, "No, not particularly." A.C. could not say whether the truck was red, green, yellow, or blue.

The prosecution showed A.C. a photograph of a truck (People's Exhibit 2) that A.C. described as being "green, blue." Asked whether she recognized the truck, A.C. initially responded, "Yes, ma'am. I think that is the car." Asked whether the photograph was of the truck that followed her, A.C. responded, "I believe so," and she then elaborated, "Yes. Now it clicks."

III.    *A.L.*

In April 2020, A.L. was 13 years old. One day that month, A.L. was walking in the neighborhood around her home with her two younger siblings, who were two and four years old, and their 44-year-old behavioral therapist, Leticia D. Leticia and A.L. were pushing at least one of the younger children in a stroller. There were no sidewalks, so the group was walking in the road.

A.L. noticed a truck behind them. A.L. identified Atkins as the truck's driver. There also was a male passenger in the truck. The truck approached the group and

4

stopped. Leticia confirmed that People's Exhibit 2 was a photograph of the truck that Atkins drove.

Atkins initiated a conversation. He asked why the group was walking on such a hot day. Leticia attempted to end the conversation, but Atkins then invited the group to his house to swim in a pool. Atkins pointed out that he lived nearby. When Atkins extended the invitation, the passenger laughed. A.L. declined the invitation, and Atkins drove away.

The house that Atkins leased did not have a swimming pool. There was a concrete or cement tub in the backyard, which could be filled with water.

One day within the next few weeks, Leticia took A.L. and her two younger siblings on another walk in the neighborhood. Leticia took a different route, because she felt uncomfortable after the first encounter with Atkins. Atkins again approached the group while he was driving his truck with a male passenger. Atkins initiated a conversation and asked the group if they needed any toilet paper. Both Leticia and A.L. felt uncomfortable. A.L. said that they did not want any toilet paper, and Atkins drove away.

A.L. did not want to speak with Atkins on either occasion. She described Atkins's conduct as follows: "He kept being persistent and it was kind of obvious that we were trying to stop the conversation and get him to leave, but he would not."

Leticia told Jacquelin that she was not going to walk with the children any longer. Jacquelin agreed with the decision and said that she did not want the children outside at all.

Later, on a Sunday, Atkins walked up to the family's house when A.L. was playing in the front yard with her two younger siblings. Jacquelin was in the side yard and heard a man's voice speaking to A.L. and her younger siblings. Jacquelin went to the front yard and saw Atkins talking to the children. Atkins was holding mail in one hand and a cell phone in the other. Atkins wanted to know if mail delivered to his house belonged to Jacquelin's family. The mail was addressed to A.L.'s next-door neighbor. Atkins walked directly past the neighbor's house to get to A.L.'s front yard. A.L. and Jacquelin believed that it was "strange" that Atkins was bringing them mail on a Sunday, because mail is not delivered on Sundays.

Jacquelin told Atkins that the mail was not addressed to her house. Atkins said that when he put the mailing address into GPS that it directed him to Jacquelin's home. The screen on Atkins's cell phone was black. Jacquelin did not see any GPS program running on Atkins's phone. Atkins left after Jacquelin told him that the mail did not belong to them. A.L. felt unsafe and afraid because Atkins knew where she lived.

After Atkins approached A.L.'s house with mail, A.L. saw Atkins in his truck "drive past [her] house at different hours of the day. Sometimes more than once. Just cruise by pretty slowly." A.L. saw Atkins drive by her house in the morning, afternoon, and at 10:00 p.m. Leticia also saw Atkins drive by the house "very slow" approximately

6

three times when she was outside with the children playing on the trampoline. Leticia did not specify which children were with her.

In early May 2020, Jacquelin was inside the garage when a neighbor called Jacquelin to alert her to something. Jacquelin walked outside and saw Atkins's "truck and [Atkins] was revving the engine and reversing and going forward in front of [the] gates." Jacquelin identified the truck as the same truck shown in People's Exhibit 2. Jacquelin asked Atkins if she could help him. Atkins told Jacquelin that he "knew [she] had some girls and he had some clothing and wanted to give them to us." Atkins said that some of the clothing was new with tags. Jacquelin felt concerned and worried that Atkins had been watching her house. Jacquelin told Atkins that they did not need the clothing. She suggested that Atkins post the clothing on a neighborhood Facebook group, of which Jacquelin was a member.

Atkins later posted in the group, offering to give away the same clothes that he had offered to Jacquelin. Atkins's Facebook profile identified his name as "Leon Denton." Jacquelin learned Atkins's real name from a neighbor. She searched for Atkins online and learned that he was a registered sex offender. Jacquelin called law enforcement and reported the encounters that Atkins had with A.C. and A.L. from March through May 2020.

IV.    *The convictions and sentence*

A jury convicted Atkins on all counts. Atkins admitted that he suffered four prior strike convictions. The trial court sentenced Atkins to consecutive sentences of 25 years

7

to life on each of the child annoyance counts and 32 months on the failure to register count.

## DISCUSSION

I.    *Sufficiency of the evidence*

Atkins contends that the evidence is insufficient to support the child annoyance conviction involving A.L.  In particular, he challenges the sufficiency of the evidence that his conduct toward A.L. was objectively and unhesitatingly irritating or disturbing.  We are not persuaded.

"Every person who annoys or molests any child under 18 years of age" is guilty of a misdemeanor.  (§ 647.6, subd. (a)(1) (§ 647.6(a)(1)).)  The same conduct constitutes a felony if the defendant has a prior conviction for an enumerated sex offense, including committing lewd or lascivious conduct against a child in violation of section 288. (§ 647.6, subd. (c)(2); *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 50 (*Clotfelter*).) The terms "annoys" and "molests" in section 647.6(a)(1) "are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to injure, another person."  (*People v. Lopez* (1998) 19 Cal.4th 282, 289 (*Lopez*).)  Section 647.6(a)(1) requires "(1) conduct a '"normal person would unhesitatingly be irritated by"' [citations], and (2) conduct '"motivated by an unnatural or abnormal sexual interest"' in the victim [citations]."  (*Lopez*, at p. 289.)  Section 647.6(a)(1) "does not require a touching" (*Lopez*, at p. 289) or any lewd act (*People v. Thompson* (1988) 206 Cal.App.3d 459, 466 (*Thompson*)).  In determining whether "the defendant's conduct

8

would unhesitatingly irritate or disturb a normal person, we employ an *objective* test not dependent on whether the child was in fact irritated or disturbed." (*Lopez*, at p. 290.) We disregard the defendant's mental state, the child's state of mind, and any past convictions the defendant might have in evaluating whether the element of objectively disturbing conduct has been satisfied. (*Id*. at pp. 290-291; *Clotfelter*, at p. 52.)

"In reviewing a sufficiency of the evidence claim, our role is limited. We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11.) "We draw all reasonable inferences in favor of the judgment." (*Ibid*.) "Matters of credibility of witnesses and the weight of the evidence are ""'the exclusive province'"" of the trier of fact." (*Ibid*.)

The record contains sufficient evidence that Atkins's conduct toward A.L. would objectively disturb or irritate a normal person without hesitation. Over the course of two months, Atkins, a 58- or 59-year-old man, initiated contact with A.L., a 13-year-old stranger, on multiple occasions. He initiated those interactions near or at A.L.'s home, which was in a very remote area. The first time that Atkins spoke to A.L. he invited her to his nearby residence to swim, but his home did not actually have a swimming pool. When Atkins later went to A.L.'s residence purportedly to deliver mail that he claimed to have received at his house, he walked directly past the residence to which the mail was addressed in order to reach A.L.'s home and talk to her. A.L. was in the front yard unaccompanied by an adult. Moreover, Atkins brought the mail with him on a day on

which mail was not even delivered. Atkins also brought girls' clothes to A.L.'s home completely unprompted and without any explanation. From that evidence, the jury could reasonably infer that the reasons that Atkins gave for approaching and initiating contact with A.L. were insincere and that Atkins repeatedly manufactured reasons to approach and communicate with A.L. Moreover, in addition to the pretextual encounters, Atkins drove by A.L.'s house very slowly numerous times during the day and at night, even though A.L.'s house was in a rural area, not near the main road, and hence not in a location that strangers' vehicles normally drove past. That constitutes substantial evidence of conduct that objectively would disturb a normal person without hesitation.

Atkins contends that the evidence is insufficient because none of his conduct had any "indicia of a sexual nature." The contention lacks merit. Section 647.6(a)(1) does not require that the defendant's annoying conduct contain any sexually suggestive component. (*Thompson*, *supra*, 206 Cal.App.3d at p. 466.) Conduct that does not contain any sexual component can objectively and unhesitatingly disturb or irritate a normal person. (*Id*. at pp. 461, 466.) Such conduct is criminalized by section 647.6(a)(1) if it was "'"motivated by an unnatural or abnormal sexual interest"'" in the victim [citations]." (*Lopez*, *supra*, 19 Cal.4th at p. 289.)

Atkins's reliance on *People v. Carskaddon* (1957) 49 Cal.2d 423 (*Carskaddon*), in which our Supreme Court found insufficient evidence of objectively annoying conduct (*id*. at p. 426), is misplaced. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on

10

its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) The facts in *Carskaddon* are distinguishable. There, the evidence showed that the "defendant was in the company of a 6-year-old girl and a 4-year-old boy in a public park, that he walked down a public street with the little girl by his side, and that when stopped and queried by the officer, [the] defendant stated that the girl was lost and he was taking her home." (*Carskaddon*, at p. 426.) The girl told a law enforcement officer that the defendant told her that he was taking her to a river. (*Id*. at p. 425.) *Carskaddon* concluded that there was "no substantial evidence of anything more than friendly noncriminal activity on the part of [the] defendant toward the girl." (*Id*. at p. 426.)

Unlike the defendant in *Carskaddon*, Atkins engaged in conduct that was not limited to a single, isolated incident but rather included multiple incidents over the course of two months in which Atkins repeatedly initiated contact with A.L. under circumstances that strongly supported an inference that he was manufacturing pretexts to interact with her. In addition, Atkins repeatedly drove by A.L.'s remotely located residence during that period at an unusually slow speed.

The facts of this case more closely resemble those in *Thompson*, *supra*, 206 Cal.App.3d 459, in which the defendant drove alongside a 12-year-old girl riding her bicycle and followed her for an extended period of time, driving at slow speeds and making U-turns to maintain contact with her. (*Id*. at pp. 461-462.) The defendant also made gestures with his hand and mouth to the girl. (*Id*. at p. 462.) *Thompson* upheld the conviction, concluding that although the behavior was not particularly lewd it "would

place a normal person in a state of being unhesitatingly irritated, if not also fearful." (*Id.* at p. 467.) Atkins's repeated behavior of initiating pretextual contact with a 13-year-old and repeatedly driving by her remote home, though not itself lewd, likewise "would place a normal person in a state of being unhesitatingly irritated, if not also fearful." (*Ibid.*)

We accordingly conclude that there was substantial evidence to support Atkins's section 647.6(a)(1) conviction as to A.L.

II.     *Alleged ineffective assistance*

Atkins contends that his trial counsel provided ineffective assistance by failing to object at trial to the admission of People's Exhibit 2, which he claims had previously been excluded by the trial court. Atkins contends that it is reasonably probable that absent the claimed error the jury would not have convicted him on the child annoyance count involving A.C. The contentions lack merit.

A.     *Relevant proceedings*

In August 2020, Atkins filed a motion to suppress certain evidence that he argued was illegally seized on the day that law enforcement arrested him at his home. Sheriff's deputy Robert Mills was part of the law enforcement team that arrested Atkins at a house on Cholla Road. One day before the arrest, Mills drove by the residence and saw a Ford pickup truck parked in the driveway. Mills took photographs of the truck from the street as he was driving by. The truck matched the description given by the alleged victims. The same truck was parked at the residence on the day of the arrest.

12

After Atkins was arrested, Mills started driving to the sheriff's station, but he turned around and returned to the Cholla Road house to take some photographs. Mills did not take any photographs during the arrest. The gate of the chain-link fence that surrounded the property was open, so Mills walked through it and up the driveway, where he "took overall photographs of the truck," including a "clearer," "up-close" photograph of the license plate. Even though Mills already had photographs of the truck, he wanted "closer-up images."

The exhibit that the prosecution showed Mills at the hearing contained two photographs on one page. The top photograph was of the truck, and a close-up photograph of the license plate appeared below.

The court excluded the exhibit containing the photographs of the truck that Mills took on the day of Atkins's arrest. The court concluded that Mills did not have a right to reenter the property, reasoning that "even though the truck is in plain view while he could have taken that photograph from the street, he didn't have the right to go back on the property anymore, and he did so."

The trial was held in February 2023. A different judge presided over the trial, and a different attorney represented Atkins at trial. The prosecution introduced People's Exhibit 2, which contained a photograph of the truck. The prosecutor described the exhibit as containing a photograph of the truck on the top half of the page and a photograph of a license plate on the bottom half of the page. Defense counsel did not

13

object to admission of the exhibit.  The prosecution showed the exhibit to A.C.,
Jacquelin, and Leticia.

   B.    *Analysis*

   "To establish ineffective assistance of counsel, a defendant must show that
counsel's representation fell below an objective standard of reasonableness under
prevailing professional norms, and counsel's deficient performance was prejudicial, that
is, there is a reasonable probability that, but for counsel's failings, the result would have
been more favorable to the defendant."  (*People v. Sepulveda* (2020) 47 Cal.App.5th 291,
301 (*Sepulveda*); *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)  We presume
"that counsel's actions fall within the broad range of reasonableness, and afford 'great
deference to counsel's tactical decisions.'"  (*People v. Mickel* (2016) 2 Cal.5th 181, 198
(*Mickel*).)

   A defendant asserting ineffective assistance of counsel on direct appeal bears a
"'difficult'" burden because "a reviewing court will reverse a conviction based on
ineffective assistance of counsel on direct appeal only if there is affirmative evidence that
counsel had 'no rational tactical purpose' for an action or omission."  (*Mickel, supra*, 2
Cal.5th at p. 198.)  "On direct appeal, if the record '"sheds no light on why counsel acted
or failed to act in the manner challenged,"' we must reject the claim '"unless counsel was
asked for an explanation and failed to provide one, or unless there simply could be no
satisfactory explanation."'"  (*People v. Caro* (2019) 7 Cal.5th 463, 488.)  When the
record contains no explanation for counsel's actions, we have "no basis on which to

determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Mickel*, at p. 198.) "Accordingly, 'except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal.'" (*Sepulveda*, *supra*, 47 Cal.App.5th at p. 301.)

The People contend as a threshold matter that Atkins has failed to establish that the photograph admitted at trial was the one that was previously excluded. We need not decide the issue. Assuming for the sake of argument that the admitted photograph is the same photograph that was previously excluded, Atkins has not "shown 'affirmative evidence that counsel could have had "no rational tactical purpose"'" for proceeding as she did at trial. (*Sepulveda*, *supra*, 47 Cal.App.5th at p. 302.) Mills testified at the hearing on the motion to suppress that he also had taken photographs of the truck from the street on the day before law enforcement arrested Atkins. The trial court excluded only the photographs of the truck that Mills took on the day of the arrest. It is possible that Atkins's counsel was aware of the pretrial ruling but also knew of or saw the photographs that Mills took of the truck on the day before the arrest. In excluding the photographs taken on the property after Atkins's arrest, the trial court noted that the photographs would have been admissible if they were taken from the street. Atkins's trial counsel could have concluded that because there probably were admissible photographs of the truck that had been taken the previous day, it did not matter which

15

photographs the prosecution admitted. Because the record is consistent with at least one reasonable explanation for counsel's failure to object, we must reject the ineffective assistance claim on direct appeal. (*Id*. at pp. 301-302.)

Atkins's only argument to the contrary is that "there was no evidence that the officer turned over the first photo to the People or that the officer even had a copy of the photo some three years after it was taken," so it is speculation to assume that there were any admissible photographs. The argument fails. To succeed on an ineffective assistance claim on direct appeal, Atkins must show "'affirmative evidence that counsel could have had "no rational tactical purpose"'" for proceeding as she did at trial. (*Sepulveda*, *supra*, 47 Cal.App.5th at p. 302.) He cannot carry that burden by speculating about whether law enforcement preserved relevant evidence.

For the foregoing reasons, we conclude that Atkins has failed to carry his burden of demonstrating that his trial counsel was ineffective.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____
J.

We concur:

MILLER _____
       Acting P. J.

RAPHAEL _____
       J.